```
        IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF VIRGINIA
                  Richmond Division
```

LEONARD ALLEN MORRISON, III,

    Plaintiff,

v.                                        Civil Action No. 3:18CV527

HAMPTON POLICE DEPARTMENT, et al,

    Defendants.

## MEMORANDUM OPINION

Leonard Allen Morrison, III, is a Virginia inmate serving multiple life sentences resulting from a series of violent crimes that he committed in the Tidewater area of Virginia in June 2017.[1] Proceeding pro se and in forma pauperis, Morrison filed this 42 U.S.C. § 1983 action[2] alleging that members of the Hampton

---

[1] Morrison is currently serving two life sentences plus 28 years for two murders, two robberies, and various firearms offenses that he committed in the City of Virginia Beach on June 10, 2017 (the "Virginia Beach Case"). (ECF No. 49-6, at 1-2.) Morrison is also currently serving an additional two life sentences plus 163 years based upon convictions in the City of Hampton for two counts of attempted capital murder, disarming an officer, three counts of robbery, three counts of abduction, conspiracy, and multiple firearms offenses arising out of an incident that took place there on June 27, 2017 (the "Hampton Case"). (ECF No. 49-5, at 1-2.)

[2] The statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

Police Department violated his rights during, or soon after, Morrison's apprehension. (ECF No. 40.) In Claim One, Morrison alleges that Lieutenant Gainer used excessive force while attempting to arrest him. (Id. at 3.)[3] In Claim Three, Morrison alleges, that during the related investigation, Sergeant Crouch unconstitutionally seized personal property that was in Morrison's possession, including a vehicle, phones, watches, and currency. (Id. at 3-4.)[4]

This matter is before the Court on DEFENDANTS' MOTION TO DISMISS AMENDED PARTICULARIZED COMPLAINT ("Motion to Dismiss," ECF No. 46) and DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ("Motion for Summary Judgment," ECF No. 48), which were jointly filed by Lieutenant Gainer and Sergeant Crouch. Lieutenant Gainer and Sergeant Crouch served a proper Roseboro[5] notice, but Morrison has failed to respond to either motion. For the reasons stated below, the Motion for Summary Judgment (ECF No. 48) will be granted and the Motion to Dismiss will be denied as moot. Claim One will be dismissed because Lieutenant Gainer's use of force was not unreasonable under the circumstances known to him at the time.

---

[3] The Court employs the pagination assigned to the parties' submissions by the CM/ECF docketing system. The Court corrects the punctuation, spelling, and capitalization and omits the emphasis in quotations from the parties' submissions.

[4] The Court previously dismissed the remainder of Morrison's claims. (See ECF Nos. 42, 43, 44, 45.)

[5] See Roseboro v. Garrison, 528 F,2d 309 (4th Cir. 1975).

Claim Three will be dismissed because Morrison has failed to show that Sergeant Crouch had any personal involvement whatsoever in the alleged violation of Morrison's rights.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility of informing the Court of the basis for the motion and identifying the parts of the record which demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." Id. at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. (quoting former Fed. R. Civ. P. 56(c), (e) (1986)). In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." United States v. Carolina Transformer Co., 978 F.2d 832, 835 (4th Cir. 1992) (citing

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). However, a mere "scintilla of evidence" will not preclude summary judgment. Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." Id. (quoting Munson, 81 U.S. at 448). Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." Forsyth v. Barr, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 n.7 (5th Cir. 1992)).

In support of their Motion for Summary Judgment, Defendants have submitted: (1) an excerpted transcript of Morrison's criminal trial in the Circuit Court for the City of Hampton ("Transcript," ECF No. 49-1); (2) an affidavit from Master Forensic Specialist A. Crouch ("MFS Crouch Affidavit," ECF No. 49-2); (3) a declaration from Corporal D. Johnson and a "Police-Related Shooting Report," (ECF No. 49-3); (4) an affidavit from Sgt. C. Crouch ("Sgt. Crouch Affidavit," ECF No. 59-4); (5) state court records from the Circuit Court for the City of Hampton (ECF No. 49-5); and, (6) state court records from the Circuit Court of the City of Virginia Beach (ECF No. 49-6).

4

At this stage, the Court is tasked with assessing whether Morrison "has proffered sufficient proof, in the form of <u>admissible</u> evidence, that could carry the burden of proof of his claim at trial." <u>Mitchell v. Data Gen. Corp.</u>, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). As a general rule, a non-movant must respond to a motion for summary judgment with affidavits or other verified evidence. <u>Celotex Corp.</u>, 477 U.S. at 324. Morrison has failed submit any such evidence.[6]

Consequently, Morrison has failed to cite to any evidence that he wishes the Court to consider in opposition to the Motion for Summary Judgment. <u>See</u> Fed. R. Civ. P. 56(c)(3) (emphasizing that "[t]he court need consider only the cited materials" in deciding a motion for summary judgment). Morrison's complete failure to present any evidence to counter Defendants' Motion for Summary Judgment permits the Court to rely solely on Defendants' submissions in deciding the Motion for Summary Judgment. <u>See</u> <u>Forsyth</u>, 19 F.3d at 1537; Fed. R. Civ. P. 56(c)(3) ("The Court need only consider the cited materials . . . .").

In light of the foregoing submissions and principles, the following facts are established for the purposes of the Motion for

---

[6] Moreover, Morrison did not swear to the contents of his Amended Particularized Complaint (ECF No. 40) under penalty of perjury. As such, the Amended Particularized Complaint likewise fails to constitute admissible evidence. <u>See</u> <u>United States v. White</u>, 366 F.3d 291, 300 (4th Cir. 2004).

5

Summary Judgment. All permissible inferences are drawn in favor of Morrison.

## II. SUMMARY OF UNDISPUTED FACTS

On June 12, 2017, Lieutenant Gainer was on patrol in the City of Hampton. (Tr. at 47-48.) At approximately 2:40 p.m., a call was received concerning a suspicious situation at a nearby GameStop. (Id. at 48.) Officer Sledge and Corporal Trowbridge were dispatched to the location. (Id.) Lieutenant Gainer monitored the call because he was the "road supervisor for the day." (Id.) When he heard that the call was upgraded to a "robbery in progress," Lieutenant Gainer activated his siren and began to proceed to the GameStop. (Id. at 49.)

While in route, Lieutenant Gainer heard a dispatch indicating that Corporal Trowbridge was engaged in a foot pursuit along Interstate 64. (Id.) The call was quickly updated to indicate that the foot pursuit had left the highway and that "they're now running to the left of [the] AMC [movie theater]." (Id.) Lieutenant Gainer adjusted his route and turned into the AMC parking lot. (Id.) After receiving a description of the suspects from Corporal Trowbridge, Lieutenant Gainer spotted Morrison and his accomplice attempting enter a silver vehicle driven by a third accomplice. (Id. at 49-50.)

Lieutenant Gainer exited his vehicle, drew his weapon, approached the suspects, and began giving commands. (Id. at 50-

6

51.) Morrison's accomplice and the driver of the vehicle both complied with Lieutenant Gainer's commands. (Id.) Morrison did not. (Id. at 51.) Morrison began to bend over, as though he was going to lie on the ground, then he "came right back up." (Id.) Lieutenant Gainer commanded Morrison again to get on the ground and Morrison started to look around. (Id. at 52.)

Concerned that Morrison was attempting "to develop a plan," Lieutenant Gainer "drew [his] weapon into [his] side," approached Morrison such that they were face-to-face and placed his hand on Morrison's neck and shoulder area. (Id. at 52-53.) Lieutenant Gainer tried to push Morrison down, but Morrison "didn't go down." (Id. at 53.)

Morrison "made a side step and was able to break free from [Lieutenant Gainer's] left hand." (Id.) Lieutenant Gainer then grabbed Morrison's clothes. (Id.) Morrison struggled to get away and he made a move to the right, at which time, Lieutenant Gainer suffered a knee injury that caused him to fall and lose his grip on Morrison.[7] (Id. at 54.) As Lieutenant Gainer was falling, Morrison grabbed the gun from Lieutenant Gainer's hand and disarmed him. (Id.)

After Morrison disarmed Lieutenant Gainer, he began to run. (Id. at 55.) However, at around that time, Corporal Trowbridge

---

[7] Lieutenant Gainer testified that his "ACL was torn," that "the meniscus was torn," that his "LCL had a sprain," and that he suffered a "fracture to the fibula." (ECF No. 49-1, at 55.)

7

arrived on scene. (Id. at 56.) Morrison reversed course and began running back towards Lieutenant Gainer pointing Lieutenant Gainer's own weapon at him. (Id. at 55.) Unarmed and believing that he was now "going to be shot," Lieutenant Gainer called out to Corporal Trowbridge to shoot Morrison. (Id. at 55-56.)

As Corporal Trowbridge approached the scene, he saw Morrison with a weapon in his hand. (Id. at 20.) Corporal Trowbridge commanded Morrison to drop the gun, but Morrison did not. (Id.) Corporal Trowbridge saw Morrison reverse course and head towards Lieutenant Gainer. (Id.) Believing that Morrison "was going to murder" Lieutenant Gainer, Corporal Trowbridge opened fire. (Id. at 21.) Nonetheless, Morrison still did not drop Lieutenant Gainer's weapon. (Id. at 21-22.) Rather, Morrison took "up a firing position" and pointed the gun directly at Corporal Trowbridge and Lieutenant Gainer. (Id. at 22.) Upon seeing this, Corporal Trowbridge continued to fire until Morrison fell to the ground. (Id.)

As other officers were securing the scene, Lieutenant Gainer began to assess his own condition. (Id. at 59-60.) Lieutenant Gainer noticed that a bullet fired by Morrison had penetrated and traversed his protective vest. (Id. at 60.) While the bullet did not penetrate Lieutenant Gainer's body, it did come in contact with his skin, causing him to bleed, and left a scar. (Id.)

8

Following the shooting in the AMC parking, Sergeant Crouch responded to the scene to investigate. (Sgt. Crouch Aff. ¶ 3.) Although Sergeant Crouch did investigate the incident, he did not "seize any property or evidence." (Id.) While on the scene, Sergeant Crouch noticed a "silver or grey" vehicle that was registered to Morrison's grandmother. (Id. ¶ 4.) That vehicle was "taken into custody of the Virginia Beach Police Department," presumably in connection to the Virginia Beach Case, and "remains impounded," by Virginia Beach authorities. (Id.)

### III. ANALYSIS

In order to state a viable claim under 42 U.S.C. § 1983, a plaintiff must allege that a person acting under color of state law deprived him or her of a constitutional right or of a right conferred by a law of the United States. See Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 658 (4th Cir. 1998) (citing 42 U.S.C. § 1983). In order to survive summary judgment for a claim under 42 U.S.C. § 1983, a plaintiff must "affirmatively show[] that the official charged acted personally in the deprivation of the plaintiff's rights." Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985) (quoting Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977)).

#### A. Claim One

In Claim One, Morrison alleges that Lieutenant Gainer used excessive force in apprehending him. (ECF No. 40, at 3.) Claims

9

of excessive force during a seizure "are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." Graham v. Connor, 490 U.S. 386, 388 (1989).

"The question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." Anderson v. Russell, 247 F.3d 125, 129 (4th Cir. 2001). "Determining whether the force used to seize an individual is 'objectively reasonable' requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Swann v. City of Richmond, 498 F. Supp. 2d 847, 854 (E.D. Va. 2007) (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).

It "has long been recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," but the reasonableness of such physical coercion depends on the specific circumstances of the encounter at issue. Graham, 490 U.S. at 396. "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical operation," but instead "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting

10

arrest or attempting to evade arrest by flight." Bell v. Wolfish, 441 U.S. 520, 529 (1979); Graham, 490 U.S. at 396.

Moreover, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. Thus, courts must allow "for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving." Id. at 397. "The court's focus should be on the circumstances at the moment the force was used and on the fact that officers . . . are not often afforded the luxury of armchair reflection." Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir.1996) (citations omitted). The Fourth Circuit "has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." Anderson, 247 F.3d at 131. "The Fourth Amendment does not require omniscience . . . . Officers need not be absolutely sure . . . of the nature of the threat or the suspect's intent to cause them harm — the Constitution does not require that certitude precede the act of self-protection." Id. at 132.

Morrison alleges that Lieutenant Gainer used excessive force in apprehending him. However, as discussed below, the record before the Court clearly establishes that Lieutenant Gainer's actions were not unreasonable under the circumstances. To the

11

contrary, it seems plain that Morrison's actions aggravated and escalated an already dangerous situation.

Applying the factors discussed in Bell and Graham, it is clear that Morrison's claim fails. First, the Court must look to the severity of the crime at issue. Bell, 441 U.S. at 529; Graham, 490 U.S. at 396. Here, Lieutenant Gainer was responding to a "robbery in progress." (Tr. at 49.) In Virginia, robbery is accomplished by utilizing "violence to the person," "fear of serious bodily harm," or the presentation of a firearm or other deadly weapon. See Va. Code Ann. § 18.2-58 (West 2021). It is a felony punishable by "not less than five years," and it carries a maximum punishment of life imprisonment. Id. Thus, from its inception, Lieutenant Gainer's encounter with Morrison involved an extremely serious offense.

The second factor contemplated by Bell and Graham requires the Court to analyze whether Morrison posed "an immediate threat to the safety of [Lieutenant Gainer] or others." Bell, 441 U.S. at 529; Graham, 490 U.S. at 396. The answer in this instance, is a resounding yes.

When Lieutenant Gainer located Morrison and his accomplices, he was alone and outnumbered. The officers pursuing on foot had not yet arrived, nor had any other backing officers. Lieutenant Gainer had no way of knowing what weapons Morrison and his cohorts may have stashed on their persons, or in their vehicle.

12

Thus, it was critically important that Lieutenant Gainer immediately gain control over the situation. Therefore, it was not inappropriate for him to approach these individuals with his weapon drawn, nor was it inappropriate for him to order them to the ground. When two of the three men complied with his commands, but Morrison did not, it became all the more imperative for Lieutenant Gainer to assert control over the situation. For if Lieutenant Gainer was unable to gain Morrison's compliance, Lieutenant Gainer ran the very real risk that Morrison's two accomplices would rethink their decision to comply, and Lieutenant Gainer would be outnumbered. Thus, it was not inappropriate for Lieutenant Gainer to use his hand to attempt to direct Morrison to the ground.[8]

When Morrison repelled Lieutenant Gainer's attempt to gain his compliance through minimal physical coercion, the situation became all the more grave. Lieutenant Gainer suffered a significant injury to his knee, which hampered his ability to defend himself and maintain control over the situation. Simultaneously, Lieutenant Gainer was disarmed by Morrison, which rendered him defenseless and at Morrison's mercy.

At no point after disabling and disarming Lieutenant Gainer did Morrison ever give any outward indication that he might be

---

[8] The severity of the situation notwithstanding, Lieutenant Gainer did not strike, kick, or choke Morrison. (Tr. at 52.)

13

willing to surrender or go peacefully. Instead of throwing Lieutenant Gainer's gun down or getting on the ground, Morrison retained the weapon and attempted to flee once again.

Upon Corporal Trowbridge's arrival on the scene, Morrison turned back toward Lieutenant Gainer, who was hobbled and unarmed, and pointed Lieutenant Gainer's own weapon at him. At that point in time, any officer in that position would rightly have been in fear for his life. The only reasonable conclusion to be drawn on these facts was that Morrison posed an immediate and serious threat to the life of Lieutenant Gainer, as well as anyone else who was nearby.[9] Accordingly, it was not unreasonable for Lieutenant Gainer to instruct Corporal Trowbridge (or any officer within earshot) to shoot Morrison.[10]

---

[9] Corporal Trowbridge testified that there were multiple civilians, including a family of four, in close proximity to Morrison while this situation was unfolding. (Tr. at 12, 21.)

[10] It is not clear that Corporal Trowbridge even heard, much less understood, Lieutenant Gainer's statement to shoot Morrison at the time that he made it. When asked "[d]id Gainer yell out to you," Corporal Trowbridge testified "[u]pon review of my body camera footage, I heard Lieutenant Gainer on my body camera screaming in a very . . . frighten[ed] tone . . . to shoot him." (Tr. at 19.) Thus, it is doubtful that Lieutenant Gainer's statement had any impact whatsoever on the fact that Morrison was ultimately shot. Indeed, it appears that Corporal Trowbridge made the decision to shoot based on his own independent assessment of the threat upon arriving on scene. Corporal Trowbridge saw Morrison disarm Lieutenant Gainer. (Id. at 18.) Corporal Trowbridge demanded that Morrison "drop his handgun." (Id. at 20.) Morrison ignored that command, as he had ignored all of Corporal Trowbridge's earlier commands during the foot pursuit. (Id. at 20-21.) Nevertheless, Corporal Trowbridge did not open fire. It was only after Corporal Trowbridge saw Morrison

14

Finally, the Court must consider whether Morrison was "actively resisting arrest or attempting to evade arrest by flight." Bell, 441 U.S. at 529; Graham, 490 U.S. at 396. As discussed above, the answer is obviously, yes.

Overall, the uncontroverted evidence establishes that Lieutenant Gainer did not apply excessive force in attempting to apprehend Morrison. Rather, Lieutenant Gainer's actions were objectively reasonable under the circumstances known to him at the time. Graham, 490 U.S. at 388; Russell, 247 F.3d at 129, 131-32. Accordingly, Claim One will be dismissed.

### B.  Claim Three

In Claim Three, Morrison alleges that Sergeant Crouch unconstitutionally seized personal property that had been in his possession following his arrest. (ECF No. 40, at 3-4.) As an initial matter, it is clear that at least some of the property in question was seized by Virginia Beach authorities, presumably in connection with the murder investigations that were ongoing there. (Sgt. Crouch Aff. ¶ 4.) However, even if this were not the case, the uncontroverted evidence establishes that Sergeant Crouch was not involved with the seizure of Morrison's properly. (Id. ¶ 3.) Thus, Morrison has failed to "affirmatively show[] that [Sergeant

---

"reverse[] course and start[] to run back to . . . where [he] last saw Lieutenant Gainer on the ground," at which point Corporal Trowbridge believed Morrison was going to "murder" Lieutenant Gainer, that Corporal Trowbridge decided to fire. (Id. at 21.)

Crouch] acted personally in the deprivation of [his] rights." Wright, 766 F.2d at 850 (quoting Vinnedge, 550 F.2d at 928. Accordingly, Claim Three will be dismissed.

## IV. CONCLUSION

For the foregoing reasons, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 48) will be granted. Claims One and Three will be dismissed. DEFENDANTS' MOTION TO DISMISS AMENDED PARTICULARIZED COMPLAINT (ECF No. 46) will be denied as moot. The action will be dismissed.

The Clerk is directed a copy of the Memorandum Opinion to Morrison and counsel of record.

/s/ REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: February 24, 2021